**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ALECKO O+G LLC,<br><br>Plaintiff,<br><br>v.<br><br>CLAYTON WILSON, PETER WILSON, CHRISTOPHER LEIKER, MICHAEL HOPSON, SATCHELL CREEK PETROLEUM, LLC, and HAVANA ROOM CIGARS, L.L.C., and HR LIQUORS, L.L.C. (collectively, d/b/a THE CLAYTON)<br><br>Defendants. | Case No. 25-12734<br><br>Jury Demand Requested |

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff, Alecko O+G LLC ("Alecko"), for its First Amended Complaint against Clayton Wilson, Peter Wilson, Christopher Leiker, Michael Hopson (collectively, the "Satchell Creek Defendants"), Satchell Creek Petroleum, LLC ("SCP"), and Havana Room Cigars, L.L.C. and HR Liquors, LLC (together, d/b/a The Clayton ("The Clayton")), alleges as follows:

**INTRODUCTION**

1. In an elaborate and egregious scheme, the Satchell Creek Defendants, through SCP and its related entities, defrauded multiple Chicago businessmen (and many others around the country) into investing tens of millions of dollars in Kansas-based oil wells that the Satchell Creek Defendants knew were dry or grossly underperforming but pretended were rich with oil.

2. As set forth in greater detail below, this group of fraudsters knew the majority of the oil wells they were peddling to investors were not viable; they falsified, concealed, or otherwise misrepresented the drill testing that confirmed as much; and they lied to investors that the wells

were poised to generate barrels upon barrels of oil per day when they knew the vast majority of the wells were duds.

3. SCP – Satchell Creek Petroleum, LLC – the mothership of a network of companies set up by the Satchell Creek Defendants to facilitate the fraud described herein, was structured so that its principals would make enormous gains whether or not wells produced or failed, at the expense of Alecko and other investors who they intentionally misled.

4. The Satchell Creek Defendants did not need the wells to produce oil in order for their fraud to be lucrative. One way they bled Alecko and others dry of their investments was by creating a web of entities that extracted fees for "completing" non-viable wells – for example, supervisory fees, water hauling fees, and testing fees – as though the wells were expected to profitably produce oil into the future once completed. They thus paid themselves handsomely for their hard "work" – servicing dry wells knowingly in vain.

5. The epitome of this outrageous fraud occurred in September 2023 when some of the investors travelled to Kansas in order to personally view a well site and were given a staged display. To woo the investors and show just how much oil was coming out of the wells, Satchell Creek Defendant Christopher Leiker ("Leiker") threatened and coerced his employee, Todd Dinkel, to pump water into a well with previously collected oil that had been held in a collection tank, in order to give the impression that the well was independently yielding oil. He then unveiled a collector bin to show the volume of oil being pumped in to the well, knowing the oil came from elsewhere. The Satchell Creek Defendants were thus so committed to their fraudulent scheme that they were willing to choreograph this obscene charade, in addition to the other blatant lies and concealments detailed below.

6. At nearly every turn, the Satchell Creek Defendants lied, concealed, and manipulated in order to enrich themselves on the backs of Alecko and other investors, pursuing oil production in bad faith because they figured out a way to become rich from dry wells. Alecko brings this lawsuit to recover, among other things, the huge sums of money it invested in these junk wells as a result of Defendants' deceptions.

## PARTIES

7. Alecko O+G LLC is a Delaware limited liability company.

8. Upon information and belief, Defendant Christopher Clayton Leiker, CEO of SCP, resides in Wichita, KS.

9. Upon information and belief, Defendant Peter A. Wilson resides in Aspen, Colorado.

10. Upon information and belief, Defendant Clayton Wilson resides in Nashville, Tennessee.

11. Upon information and belief, Defendant Michael Hopson, CFO of SCP, resides in Aspen, Colorado.

12. Satchell Creek Petroleum, LLC is a Kansas limited liability company.

13. The Clayton ("The Clayton") is comprised of two Illinois limited liability companies that together operate a private membership cigar club in Chicago - Havana Room Cigars, L.L.C. and HR Liquors, LLC.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under 18 § U.S.C. 1961 et seq. (the Racketeer Influenced and Corrupt Organizations Act ("RICO")). This

Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiff's federal claims.

15. Venue is proper in this judicial district under 18 U.S.C § 1965(a) and under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois and because Defendants transacted business in this district.

16. Each of the Defendants has engaged in substantial business in this judicial district and has minimum contacts with this district, such that each of them are subject to personal jurisdiction here.

## FACTS

***Black Tea Oil and Satchell Creek Petroleum***

17. SCP is a corporate vehicle used by the Satchell Creek Defendants to perpetuate the crimes and frauds alleged herein. Upon information and belief, leading up to his involvement in this scheme, Leiker had worked in the oil well exploration business in Kansas for many years, operating a company known as Black Tea Oil, LLC ("BTO") since 2012. Upon information and belief, BTO sold off most of its wells in 2016. BTO was owned by Partners Petroleum, LLC, a Wyoming entity operated out of Aspen, Colorado. Satchell Creek Petroleum "evolv[ed]" from Black Tea Oil:




18. Before Plaintiff became ensnared, Leiker had used Black Tea Oil to perpetuate earlier schemes. It is believed that, while Black Tea Oil had some success, investors Cecil O'Brate, Victor Klotz, and John Farleigh lost over $25 million cumulatively. A former accountant to Black Tea Oil, who worked with Leiker from approximately 2011 until 2015 or 2016, estimated that $82 million dollars had been spent in a mere 18 months. Similar to the Satchell Creek schemes, Leiker would ignore geological test results, complete wells regardless of their viability, and pass along excessive costs to investors. For instance, he would charge investors $150/acre for leases, while he obtained those leases for $50/acre (an oil field was estimated by the accountant to be ~10,000 acres). He further stated that oil was collected from multiple wells into a common depository; this was done to hide unproductive wells. The accountant believed Leiker would spend the money on personal indulgences, such as extravagant vacations, drugs, and private aircraft usage.

19. The accountant also noted that Leiker had started another entity, "Black Stone Petroleum," prior to converting Black Tea Oil into Satchell Creek Petroleum.

20. Upon information and belief, Satchell Creek Petroleum has the following ownership structure; notably, and similar to the Black Tea Oil scheme, an entity named "Partners Petroleum" owns operator Satchell Creek Petroleum:




21. In July 2022, Satchell Creek Defendant Michael Hopson ("Hopson") filed articles of incorporation for Satchell Creek Petroleum, LLC ("SCP") with the Kansas Secretary of State. As reflected on an investor prospectus, SCP is a successor and/or affiliated company of BTO.

22. Upon information and belief, Partners Petroleum is largely controlled by a combination of Peter Wilson/Clay Wilson (via their affiliation with DAK and DAK2), Leiker (owner of Royaltea, LLC), and Hopson (Hopson is thought to be affiliated with an entity called "HKP2," which plaintiff presumes bears some relation to the "HKP" entity with 12.5% share of Partners Petroleum in the above diagram).

23. Upon information and belief, the four individual Satchell Creek Defendants were in constant communication with one another, and constantly coordinating with one another.

***Peter Wilson and Michael Hopson Work Together to Secure Investments in Their Scheme***

24. Leiker (the only one with oil drilling experience) and Hopson teamed up with the father-son duo of Peter Wilson and Clay Wilson, who spread the false successes of Satchell Creek to lure investors in furtherance of their various schemes, primarily through their ability to access and lure high-net investors at a membership-only cigar bar in Chicago, The Clayton, which Clay Wilson (along with Mark Walter and Donald Thompson) owned and operated.

25. Peter Wilson and Michael Hopson worked hand-in-hand throughout the process of securing money from Alecko.

26. On April 1, 2023, Peter Wilson wrote to Alecko: "Thank you for your interest in ***our*** project. Steve, I have copied Daryl Cramer who you will be working with to coordinate from ***our side***. Daryl is also a good friend and has represented ***us*** in various legal situations ***concerning this venture*** and is familiar with all aspects of the company. To start with, Mike will forward you all pertinent documents relating to both Feature Drilling and Satchell Creek Petroleum that you don't already have." (emphases added). Hopson responded, "Good morning gents. Steve and Alex it was great to meet and spend time with both of you and I appreciate you two taking the time to come to Kansas earlier in the week. I will be working with our attorney to get you all the necessary documents for both Feature and Satchell for further review." The deal then began to progress.

27. On April 10, 2023, Hopson sent investor Steven DeGraff a draft of a "Feature Drilling, LLC Operating Agreement" which provided that "Christopher C. Leiker and Mike Hopson shall be and hereby are appointed the initial Managers of the Company," with Hopson signing on behalf of "Partners Drilling LLC." Peter Wilson was also a recipient.

28. On April 10, 2023, Hopson emailed DeGraff with Peter Wilson in cc that "Each JOA will have every investors *[sic]* pro rata share and this will come over in Pete's MOU." The "cap structure" was said to consist mostly of an entity controlled by "Chris, Pete, and Mike".

Hopson included "Black Tea Oil LLC" in his email signature, and used an "@blackteaoil.com" email address for this communication.

Partners Drilling LLC 58.9% (Chris, Pete, and Mike)

29. Alecko provided a terms sheet dated May 2, 2023, formally addressed to Pete Wilson and Michael Hopson, for a $3 million loan "to provide funds to purchase Professional Pulling Services and provide general working capital." Hopson signed the letter and returned it via email, with Peter Wilson included on the email.

30. On May 5, 2023, as various documentation relating to Alecko's investment was being prepared, Daryl Cramer, Esq. wrote to DeGraff, "Steve, I just spoke with ***Pete and Mike*** and wanted to follow-up on open items (at least at a high level)." (emphasis added).

31. Also on May 5, 2023, Hopson (this time from mjh11holdings@gmail.com) wrote to DeGraff, again with Peter Wilson in cc. Hopson was describing what seemed to be an emergency purchase of equipment. Hopson stated that "Professional Pulling Services [is] the company that owns the six completion rigs that we are in desperate need of which is what is being used on the Sources of Uses from the loan to close which I am flying there Sunday night to keep alive with hopes of a Monday close." He closed the email by saying, "***Pete and I*** are available anytime to jump on a call." (emphasis added).

32. The close relationship between Hopson and Wilson was demonstrated in August of 2024 when investor Peter Strauss demanded explanations from Hopson regarding an email Hopson had sent (this time, from an "@featuredrilling.com" email address) containing a summary of transactions and ownership of some of the entities involved. Peter Wilson responded to Strauss, "You had the right to sell your pro rata share not 15%. You declined we talked about this many

times." This suggests that both Wilson and Hopson played active roles in soliciting and structuring investment in defendants' schemes.

33. The Satchell Creek Defendants structured each phase of investment in the SCP wells as an independent Joint Operating Agreement ("JOA"). Each JOA had its own set of wells in Kansas, distinct investors, and its own operating agreement. For example, the first investment round, JOA-1, was made up of 7 wells. JOA-2 was originally made up of 10 wells and was later amended to pertain to only one well – the Worcester A1-28, one of the very few wells out of the more than 70 that were drilled by SCP to actually produce oil. JOA-3 was originally made up of 10 wells and was later amended to 19 wells when 9 junk wells from JOA-2 were added. And so on.

***The Clayton***

34. Upon information and belief, the Clayton is owned by some combination of Mark Walter, Donald Thompson, and Clay Wilson, or entities with which they are associated.

35. According to Illinois Secretary of State records, as of at least March 3 2022, HR Liquors, L.L.C. (the entity that owns The Clayton's liquor license) was managed by Clay Wilson, Donald Thompson, and the late Guy Hancock, who passed away in May 2021. Upon information and belief, Clay Wilson and Donald Thompson continue to manage The Clayton presently. Donald Thompson is also the current manager of Cleveland Avenue, LLC, which is the manager of Havana Room Cigars, L.L.C.

36. In coordination with Leiker and Hopson, Clay and Peter Wilson used The Clayton's facilities, infrastructure, e-mail server, and private membership list to access and then lure high net-worth individuals into investing into the fraudulent oil venture described herein.

37. Clay Wilson would identify potential targets by systematically approaching various individuals who became members of The Clayton. He would leverage his knowledge of the membership base, and would coordinate when and how to approach a member in order to float the dry well investment as a lucrative, insider-only opportunity to make money off oil. This was done in coordination with Leiker and Hopson who would ultimately secure the investment by presenting the oil technicalities and financial façade of the scheme.

38. Clay Wilson would receive special "finder's fees" from SCP whenever he was able to catch an investor by exploiting their membership at The Clayton in this fashion. In May 2023, Clay told investor Peter Strauss that he was going to be able to generate more barrels of oil as a result of securing an investor from The Clayton: "I got more because I brought in an investor from The Clayton who just wrote a check for $9M...I worked out a deal with them for my fee." The Clayton also benefitted from this dynamic because it provided members with a sense of special access to lucrative investment opportunities which were not generally known, affirming its aura as a highly exclusive social club to which membership was highly desirable. His ownership interest in the Clayton gave Clay Wilson legitimacy as a source of valuable investment information, and Clay Wilson providing members of The Clayton with that type of inside investment scoop reinforced The Clayton's exclusive status. Giving members of The Clayton a feeling like they had access to valuable non-public information by virtue of their membership at the club was part of Clay Wilson's role and central to the what The Clayton seeks to offer its members.

***Well "drilling" and "completion"***

39. The Satchell Creek Defendants' fraud was predicated upon inverting industry standards to intentionally develop knowingly non-viable wells to completion.

40. There are two basic phases to drilling for oil: drilling and completion. Drilling a well is a process for determining, in the first place, whether the well is dry or viably produces oil. Drilling a well costs approximately $200,000.

41. If a well is found to be viable – that is, after drilling, it is identified as oil-producing (rather than dry or producing only water or small amounts of oil) – the next phase is "completing" the well. Completing a well brings the costs to approximately $450,000 and involves (among other things) piping, cementing, casing, and perforating.

42. Under normal circumstances, wells that in the drilling phase are found to be dry or produce little oil, are not completed. Instead, they are filled in, and the exploratory cost of that well is capped at the initial $200,000 for drilling. Only viable wells go on to the completion stage. As one of the geological experts interviewed in this case stated, it is "not the worst thing to hit a dry hole. It is the worst thing to pipe a dry hole."

***The Satchell Creek Defendants "complete" wells which they know are non-viable.***

43. One prominent feature of the fraud was that the Satchell Creek Defendants intentionally poured investor funds into "completing" wells that they knew to be entirely dry, to have only water, or very little oil (again, akin to the scheme used by Black Tea Oil years before).

44. They did this for at least two reasons: first, because having "completed" wells gave the impression that the well venture, as a whole, was successful. Indeed, Peter Wilson, on behalf of the other Satchell Creek Defendants, repeatedly represented that every well SCP drilled hit oil. Second, and more directly proximate to lining their pockets, the Satchell Creek Defendants, through a set of entities they created for this purpose, extracted significant salaries and fees for completing non-viable wells, and then servicing them into the future (while knowing no meaningful oil production was to follow).

45. For example, Satchell Creek Defendants Michael Hopson and Peter Wilson, who lived in Aspen, Colorado, and Clay Wilson, who lived in Nashville, Tennessee, all received "supervisory fees" for overseeing the completion of wells, though they were not even physically present to supervise the process. Upon information and belief, Clay Wilson visited the field approximately one time in the roughly two years during which well completion occurred. Yet all of them banked hefty fees for supposedly overseeing the "completion" process, as described more fully below.

46. The Satchell Creek Defendants also pocketed fees for performing water mitigation and water hauling services on the non-viable wells, through entities they owned and controlled and which were specifically created for this fraudulent purpose. In November 2022, the Satchell Creek Defendants founded Hydratech LLC ("Hydratech"), with Hopson as manager and Leiker's brother as a member. Hydratech, and one of its members, Partners H20, LLC (another Aspen-based entity created by the Satchell Creek Defendants, also with Hopson as manager) was set up to perform water-related services on the non-viable wells as an additional means of extracting revenue from investor dollars while knowing no meaningful oil production would be forthcoming.

47. The Satchell Creek Defendants also founded Black Tea Oil Leasing, LLC ("BTO Leasing") on May 26, 2023, after many of the wells were drilled (and known to be non-viable). BTO Leasing is owned by Royaltea, LLC (upon information and belief, owned by Leiker), DAK2, LLC (upon information and belief, owned/controlled by some combination of Clay and Peter Wilson), and HKP2 Holdings, LLC (owned, upon information and belief, by Hopson), and was another means of enriching the Satchell Creek Defendants with investor funds. BTO Leasing charged the investors leasing fees – approximately $50,000 per well. Again, it did not matter to BTO Leasing whether the wells produced or not. As set forth more fully below, the leasing fees

charged were a distinct sham perpetrated on Alecko and other investors, as no leasehold rights were ever actually transferred to them (though they had contracted to receive those rights and were told they had them).

48. The Satchell Creek Defendants also disguised "finder's fees" for Clay Wilson, the one who lured Chicago-based investors at The Clayton, that totaled approximately 15% of investor contributions. These fees were disguised as Intangible drill costs and lease and well equipment.

49. These are a few examples of how the Satchell Creek Defendants saw a gain to be made from the mere activity of drilling a well and completing it regardless of the presence of oil.

***Drill stem testing reveals most wells to be non-viable.***

50. To be sure, the Satchell Creek Defendants knew most wells did not merit completion because they received drill stem testing ("DST") results indicating as much.

51. DST is performed after the initial well drilling to determine the quality and viability of a well. DST is directed by a geologist who provides the parameters for the testing onsite. DST results are considered so advanced and determinative that an operator can know the quality of a well with certainty upon obtaining those results. DST results determine whether a well should be completed or not. Wells that fail DST are to be plugged, and wells that pass DST are recommended by the geologist to be completed.

52. Prior to April 2023, SCP conducted DST for all of the "JOA-1" wells. Of 21 wells designated as part of JOA-1, 11 were sold to third parties prior to their completion. One well, the Worcester A1-21, was deemed to produce oil. Of the remaining 9 wells, six were completed despite being non-producing, and three were plugged.

53. Prior to April 2023, eight other wells (scattered between JOA-3 and JOA-4) for which SCP conducted DST were producing.

54. Beginning in April 2023, Chad Geist, the brother of Satchell Creek's office manager, Garrett Geist, began the process of drill stem testing ("DST") for the Satchell Creek wells.

55. Chad Geist – who had not performed DST work in the past – purchased Eagle Testing, an inactive DST company, and sold it to Leiker, who renamed it Feature Testing. Chad Geist thus operated Feature Testing at the pleasure of Leiker. In other words, Leiker controlled and directed the testing company that was to make an initial evaluation as to the viability of the Satchell Creek wells that he and the other Satchell Creek Defendants then packaged for investment.

56. Chad Geist found that no matter the results of the DST and the recommendations by the geologist, Leiker did what he pleased, routinely completing wells that failed the DST.

57. Leiker would often have DST repeated 2-3 times on the same well, always with the same results, and would nonetheless go on to complete the well even where testing indicated it should be plugged, not completed. Chad Geist and the geologist, Sean Deenihan ("Deenihan"), would question to each other why they were even going through the motions of conducting the testing, as the results appeared immaterial to Leiker's decision to complete a well. Deenihan has indicated that Leiker repeated DST testing far more than any other customer he's worked with.

58. Of the approximately 40 Satchell Creek wells on which Chad Geist performed DST, only four were determined to have passed (wells called "The Triple Time," "Hobbs 134," and two Worcester wells).

59. In or about November 2023, when Chad Geist tested the last well (called "Knoll Circle K"), Leiker instructed him to falsify the fluid retrieval analysis, a test where fluid samples collected from the well are separated in a centrifuge to determine how much oil was found. In the case of the Knoll Circle K centrifuge analysis, virtually no oil was located.

60. Leiker directed Chad Geist to falsify the percentage of oil found in the Knoll Circle K centrifuge testing. Chad Geist initially refused this demand, and only after Leiker continually pressed him did Chad Geist begrudgingly record a 1% oil content, the lowest amount he could record in a "positive" test result.

61. On one occasion, Garrett Geist, an office manager for Satchell Creek Petroleum, confronted Hopson about Satchell Creek's practice of completing non-viable wells. Garrett Geist said to Hopson words to the effect of, "Mike, what the fuck are we doing setting pipe on this – there's nothing here." Hopson replied, "I don't know. Chris [Leiker] knows something."

62. Experts retained to examine the viability of the Satchell Creek wells commented that "most of the above wells probably never should have been completed," and that "many wells…did not exhibit adequate reservoir quality via geological description or drill stem test [DST] results to provide a profitable producing well."

63. Deenihan, the geologist, also noted that the pace at which Leiker was drilling wells stood out to him. He noticed that Leiker would drill multiple wells near each other even when poor testing results indicated no more wells should be drilled in that area. Deenihan also recalled that Leiker would pipe and case some wells, but then would not perforate them in order to complete the "completion," ultimately abandoning them instead.

***Alecko is lured at The Clayton and is intentionally deceived into investing.***

64. Alecko and its principals were among the dozens of victims of this investment fraud; the victims include, but are not limited to, Palmetto State Drilling I, II, IV LLCs, S&S Exploration LLC, Justin Sonntag, Bryan Schroder, and Will Ortale.

65. Alecko was initially lured into participating in the investment when its principal Alex Pissios ("Pissios"), a member of The Clayton, was approached by Clay Wilson while at the

club in or around March 2023. Unprompted, Clay Wilson told Pissios about a "great opportunity" to invest in oil. Clay Wilson described how he and his father were "killing it" in an oil venture and had teamed up with Leiker (who he said was familiar with the oil industry), who they convinced to come out of retirement in order to pursue a new oil venture. Pissios communicated with another Alecko principal, Steven DeGraff ("DeGraff") about exploring the opportunity. As of this date, Clay Wilson knew that the investment was a bad one, and that it was intentionally designed as such.

66. Other investors, including Peter Strauss, were similarly lured into the Defendants schemes via The Clayton.

***The Satchell Creek Defendants e-mail Alecko with materially and knowingly false information to lure Alecko's investment.***

67. Following Clay Wilson's deceptive remarks to Pissios at The Clayton, DeGraff began engaging in due diligence on behalf of Alecko to assess the merits of the investment. On March 6, 2023, DeGraff e-mailed Clay Wilson telling him he was going to give him a quick call to "get the lay of the land before our group call," and asked Clay to share the name of the company associated with the investment. Clay Wilson responded: "Satchel Creek – is the name of the business. It doesn't have a website yet, putting all that together now. Feature Drilling – is the name of our drilling/equipment company."

68. Later that day, DeGraff participated in a group call with Clay Wilson, Peter Wilson, Bryan Griffin, Josh Reitman, and Mike Hopson. On that call, Clay Wilson, Peter Wilson, and Mike Hopson touted the oil venture as a highly successful and lucrative opportunity.

69. On March 9, 2023, Hopson (with Peter and Clay Wilson cc'ed) e-mailed DeGraff for the first time, stating that Peter had asked him to send DeGraff "detail about our oil entities." (the "First E-mail"). Attached to the First E-mail were eight attachments consisting of:

a. "Black Tea Oil, LLC's The Prolific & Bell Prospect" (the "Initial Prospectus"). Hopson noted that "Black Tea Oil is the operating company in the past and is now operating as Satchell Creek Petroleum LLC");

b. sample Joint Operating Agreements ("JOAs") (one for Graham County and one for Butler County);

c. a "Pro Forma based on a[n] 8 well prospect," a sample "AFE" (Authority For Expenditure) which was based upon the Worcester A1-28 well (which was intentionally selected as the example because it was one of the only producing wells among numerous duds – though this information was not shared);

d. a spreadsheet purporting to show "current wells" and "current AFEs";

e. a "6 Rigs 3-year Projections" spreadsheet; and

f. a list of "Current Inventory Assets for Feature Drilling"

70. Hopson additionally noted that "We are in the process of completing the first five wells of this prospect with one beginning production tomorrow."

71. Nearly everything about the First E-mail was a sham.

72. The Initial Prospectus contained materially false statements of fact. First, it touted the success of BTO, stating it had "been successful in both locating and developing several new discoveries in the Kansas Oil Industry," was "placed at #19 on the Top 50 Oil Producers list for the State of Kansas," and in 2014 "was in the top 5 most-active Kansas operators, drilling more than 60 commercial oil wells." The Initial Prospectus also boasted that the company "drilled and produced 1,167,438 barrels of oil between 2014 and 2016," and "maintain[ed] some of the best stats in the state."

73. The Initial Prospectus also falsely stated that BTO "has over a 90% success rate drilling commercial wells and eliminating much of the potential risk of a dry, nonproducing well," and that their wells "Averaged over 40 BOPD (Barrels of Oil Per Day) after initial production."

74. However, by the time these knowingly false statements were made, BTO had already collected and squandered millions of dollars from other investors who were constantly needing to pump funds into BTO to keep the operation going, making their investment a losing venture. The Initial Prospectus also concealed that BTO had multiple predecessor companies that were colossal failures. As described earlier in this Complaint, Leiker had stolen and misused millions in investor dollars from 2012 through 2017 in "Black Tea Oil, LLC," and from 2017 through 2019 in "Black Stone Petroleum, LLC." In other words, by the time the Satchell Creek Defendants shared the BTO prospectus with DeGraff in March 2023, they already knew the company had left a trail of carnage behind it, and was far from the "successful" company as portrayed in the prospectus, with "over a 90% success rate drilling commercial wells," and having "drilled and produced 1,167,438 barrels of oil between 2014 and 2016." Its success rate was substantially lower, and by all metrics the company was a failure. The Initial Prospectus sent to DeGraff was thus intentionally misleading, and portrayed BTO as a successful oil-producing company when it was in fact a spiraling black hole for investment dollars.

75. Also embedded in the Initial Prospectus was a second scheme for extracting money from the Satchell Creek Petroleum investors. The Initial Prospectus indicated that in exchange for investment dollars, investors would receive a "lease" for the wells in which they invested. However, as described more fully below, the Satchell Creek Defendants never actually transferred lease rights to the investors as they stated they would and had done, and knew at the time they sent the Initial Prospectus that lease rights would not in fact be extended to Alecko and other investors.

76. The other attachments to the First E-mail also contained material misrepresentations and/or concealments. On the "Clay Well and AFE Schedule," an excel spreadsheet purporting to list the various wells, their corresponding JOAs, and their status, the Satchell Creek Defendants stated:

a. That the well "Place A1-26" had a status of "Pumping." But that well, which was "completed" on or about July 1, 2022, was non-producing. At the time Hopson sent the First E-mail, they knew Place A1-26 was a non-viable well.

b. That the well "Place A1-23" had been "completed" with the "need to perforate additional zones." But that well was "completed" as of December 5, 2022 and was also non-producing. The testing associated with "Place A1-23" was also completed by on or about December 5, 2022 and the Satchell Creek Defendants knew at the time of the First E-Mail that testing showed this to be a non-viable well.

c. That the well "Masters A1-23" had been "completed" with the "need to perforate additional zones." But that well had not been completed until the following month, in April 2023 and it was ultimately non-producing. The testing associated with "Masters A1-23" was also completed by on or about December 12, 2022 and the Satchell Creek Defendants knew at the time of the First E-Mail that testing showed this to be a non-viable well.

d. That the well "Cathedral A-1" needed to be completed. But that well was ultimately plugged, and the testing associated with "Cathedral A-1" was completed by on or about January 19, 2023 and the Satchell Creek Defendants knew at the time of the First E-Mail that testing showed this to be a non-viable well.

e. That the well "Cathedral A-3" was "pumping." But that well, which was completed on or about January 3, 2023 was non-producing, and the testing associated with "Cathedral A-3" was completed by on or about October 1, 2022 and the Satchell Creek Defendants knew at the time of the First E-mail that testing showed this to be a non-viable well.

f. That the well "Worcester A1-21" would "Start pumping Monday [March] 13th," but that well was not completed until on or about March 21st, and could not have started pumping on the 13th prior to completion, as represented.

77. This spreadsheet overview of well statuses, attached to the First E-mail, thus contained materially and knowingly false statements of fact in order to present the then-existing set of wells as poised for production across the board.

78. The Satchell Creek Defendants also provided DeGraff with a "6 Rigs 3-year Projections" spreadsheet, as attached to the First E-mail. However, the Satchell Creek Defendants never had six rigs, nor did they ever intend to purchase a total of six rigs; they only had four. They thus knowingly inflated the number of rigs in order to present a more robust drilling program than they actually had. This, too, was a material and knowingly false statement of fact as contained in the First E-mail.

79. On March 21, 2023, Peter Wilson (with his son, Clay Wilson, cc'ed), e-mailed DeGraff and another Alecko principal, Josh Reitman ("Reitman") "the most recent financials for both Feature Drilling and Satchell Creek Petroleum." He attached a Balance Sheet and P & L and indicated "this is a fairly accurate picture." This spreadsheet again falsely claimed that 6 rigs existed, rather than 4. It also omitted from Feature Drilling's liabilities a $3.6 million dollar loan it received from S&S Exploration on or about October 26, 2022, and presented it as "Equity."

80. On March 29, 2023, the day after a meeting at The Clayton with Pete and Clay Wilson, Peter Strauss and his wife, and members of Alecko in which Pete and Clay Wilson discussed SCP's current and future successes, Peter Wilson flew DeGraff and Pissios to Kansas to inspect some of the well sites referenced in the materials that the Satchell Creek Defendants previously shared with him. They visited the wells, then flew to SCP's offices in Wichita for further discussions with relevant personnel, including Pete Wilson, Leiker, and Garrett Geist. The offices had the appearance of an impressive oil well development company with geological maps on display. In these discussions, there was never any mention or indication that some of the wells that SCP had previously tested were dry or underperforming. Instead, a rosy picture of producing wells across the board was presented.

81. On April 11, 2023, Mike Hopson e-mailed DeGraff (with Peter Wilson cc'ed) and shared two spreadsheets – one showing the list of current investors for JOA-2, and one showing the list of current investors for JOA-3. Notably, the JOA-2 investment now only involved one well, though the well summary attached to the First E-mail, sent less than a month prior, reflected that JOA-2 had many more wells. No explanation was provided for why JOA-2 wells had been redistributed to other JOA investments.

82. At the time Mike Hopson and the Wilsons were soliciting Alecko's investment in JOA-2 and JOA-3, he and the other Satchell Creek Defendants already knew that at least three of the 10 wells identified as part of JOA-3 were non-producing. For example, on the JOA-3 attachment to Mike Hopson's April 11th e-mail, wells "Worcester A2-28," "Bell A3-31," and "Bell A4-31" were identified as wells that were part of the JOA-3 investment opportunity. But Mike Hopson and the other Satchell Creek Defendants knew that, as of the date of Hopson's e-mail, those three wells were non-producing. Testing on Worcester A2-28 was completed by on or about

March 19, 2023 and revealed it as non-viable; testing on Bell A3-31 was completed by on or about March 26, 2023 and revealed it as non-viable;  and testing on Bell A4-31 was completed the day before, on April 10, 2023 and revealed it was non-viable (it was later plugged).

83. Later that afternoon, Hopson e-mailed DeGraff again with more false information (cc'ing Peter Wilson). In the context of trying to secure a separate loan from Alecko to support Feature Drilling (and while also still pursuing Alecko for investment dollars for the JOAs), Hopson attached a spreadsheet called "Current Well Status 4.11.23" which purported to describe the current status of the wells. This spreadsheet again materially misrepresented the status of certain wells by stating:

a. That the well "Place A1-26" was falsely described as "pumping" though it was "completed" on or about July 1, 2022 but was non-producing.

b. That the well "Liggett A-1" was "waiting for completion" though it was already completed nearly six months prior on or about November 28, 2022 (when testing completed no later than November 17, 2022 confirmed it should not have been because it was non-producing), and the well was non-producing.

c. That the well "Place A1-23" was "waiting for completion" though it was already completed on or about December 5, 2022 (when testing completed no later than November 28, 2023 confirmed it should not have been because it was non-producing), and the well was non-producing.

d. That the well "Masters A1-23" was "waiting for completion" though it was already completed on or about April 1, 2023 (when testing completed no later than December 12, 2022 confirmed it should not have been because it was non-producing), and the well was non-producing.

e. That the well "Cathedral A-1" was "waiting for completion." This well was completed the day after Hopson sent this April 11, 2023 e-mail, but should not have been because testing completed no later than January 19, 2023 confirmed it should not have been because it was non-producing. This well was ultimately plugged because it was non-producing.

f. That the well "Cathedral A-3" was "pumping" even though testing completed no later than October 1, 2022 confirmed it was non-viable.

g. That the well "Bell A1-31" and the well "Worcester A2-21" were "waiting for completion" though they had already been completed on or about March 17, 2023 and March 29, 2023, respectively.

h. That the well "Bell A4-31" had a status of "drilling" even though testing completed no later than the day before this e-mail revealed it was a non-producing well (that was ultimately plugged).

84. In other words, the "Current Well Status" that Hopson e-mailed to DeGraff on April 11, 2023 contained knowing and material misrepresentations regarding the status of these wells in order to present a picture of a desirable oil investment opportunity.

85. Two days later, on April 13, 2023, DeGraff e-mailed Hopson asking for more information and clarity on evaluating well reserves. He requested that Hopson "send any information that the company maintains regarding reserves, specifically as to the wells that have been drilled to date. I started talking to Pete about how it is determined but would really like to understand it better. Questions like who determines and verifies it (e.g., Geologist), what paperwork is prepared to quantify it (what is the industry standard), what does a bank or lender

rely on if they were to finance the reserves, what does a Purchaser want to know when purchasing a well and the valuation techniques or formulas used to value it (e.g., discounted cash flow)."

86. DeGraff was thus trying to conduct due diligence on behalf of Alecko prior to the multi-million dollar investment it was to make in May 2023. DeGraff's request of Hopson was information largely contained in the DST reports.

87. In response, Hopson stated "At this point of our operation the only method available until the well is seasoned (producing for minimum of 90 days and preferably 180 days) is Geological Reserve Estimate provided by a contracted on site geologist. A report was created for our Worcester A1-28 that you saw pumping and it's attached." Hopson thus chose to omit reference to the already-completed DST reports, and strategically provided information on Worcester A1-28, the only well in JOA-2, and the only successful well up to that date.

88. Hopson also stated to DeGraff that "the general rule of thumb on valuing the well is $70,000 per barrel of oil daily at $70 a barrel oil."

89. In responding to DeGraff, Hopson also intentionally withheld the available DST reports from the 9 plugged or non-producing wells in JOA-1 and the DST reports from the 7 wells already drilled in JOA-3 (3 of which were non-producing or plugged). Instead, the proforma data that Hopson created and provided to Alecko reflected ***all*** the wells to be producing an average 20 barrels a day.

90. Hopson also intentionally withheld data from the available DST reports for the 3 wells already drilled in JOA-4 that was only going to have 5 wells in total. The proforma that Hopson provided Alecko regarding JOA-4 showed each well as poised to produce 40 barrels per day. But of the three wells that had already undergone DST at the time of DeGraff's inquiry, 2 of the 3 wells currently produce 1 barrel per day, and the third produces 3 barrels per day – data that

was known and expected by the Satchell Creek Defendants based upon the already-completed DST reports from those wells.

91. Prior to Alecko's investment in May 2023, the Satchell Creek Defendants also intentionally withheld from Alecko the fact that 5 more wells were drilled for JOA-3 and of those 5 wells, two were immediately plugged, and the other 3 were either non-producing or barely producing oil.

92. As a result of receiving the materially misleading information described above (and as a result of *not* receiving intentionally withheld information) Alecko went on to invest approximately $4 million in JOA-3, $1.3 million in JOA-4, and $32,181 in JOA-2. These payments were made as follows:

a. $3,967,819 wire for investment in JOA-3 on May 22, 2023 to SCP's account at The Bennington State Bank;

b. $32,181.00 wire for investment in JOA-2 on May 22, 2023 to SCP's account at The Bennington State Bank;

c. $1,331,289 wire for investment in JOA-4 on July 17, 2023 to SCP's account at Equity Bank.

***Satchell Creek Defendants continue lying to Alecko about well productivity after Alecko's invests, to lure Alecko to remain in and/or expand its investment.***

93. In order to seal Alecko's investment, in the weeks leading up to Alecko's initial investment of over four million dollars, Satchell Creek Defendants texted Alecko's principals, Pissios and DeGraff, in order to give the impression that the venture was highly successful.

94. On April 10, 2023, Peter Wilson on behalf of the Satchell Creek Defendants texted DeGraff and Pissios that "on top of the [wells] which we hit last week we also hit the bell #4 which has a 40 feet cut of oil in the Mississippian. We are on a roll. We are now programmed to drill,

approximately 27 wells already located in the next 30 days! We are the number one drilling operator in the State of Kansas." This statement was materially false when made. Though testing on Bell A4-31 was completed as of April 10, 2023 (the same day of Peter Wilson's text message), that well was plugged as non-viable. Moreover, SCP was not the "number one drilling operator in the State of Kansas."

95. On April 19, 2023, Peter Wilson on behalf of the Satchell Creek Defendants, texted Pissios and DeGraff stating, "Just hit the W9, really good well." This statement was materially false when made. The "W9," referring to the well Worcester A9-21, was not tested until the end of June 2023 and it was a non-viable well.

96. On April 23, 2023, Peter Wilson on behalf of the Satchell Creek Defendants texted DeGraff stating "hit W10 this morning." However, the "W10," referring to the well Worcester A10-21, was not tested until the end of June 2023 and was a non-viable well. The next day he told Pissios and DeGraff via text message that the tests for W10 "are good with high pressure," another statement that was knowingly false when made.

97. In their ongoing efforts to pressure Alecko's investment, the Satchell Creek Defendants, via Peter Wilson, continued texting Pissios and DeGraff with false statements giving the impression that the venture was successful. On April 25, 2023, Peter Wilson texted them that they just got the test back on "Bell #5" and that there was a "good show of oil." Bell #5 refers to either Bell A5-31 or Bell A6-31 neither of which, upon information and belief, had a "good show of oil."

98. On May 4, 2023, Peter Wilson, on behalf of the Satchell Creek Defendants, texted Pissios and DeGraff to let them know that their four million dollar investment in JOA-3 was highly lucrative, as JOA-3 had "15 wells [which] is worth between $9 and $12mm and rising. That does

not include the completion of another 5 wells." But as of that date, testing had only been completed on 12 wells designated as part of JOA-3, at least five of which were not viable.

99. In May 2023 Peter Wilson, on behalf of the Satchell Creek Defendants (who were part of the group text) sent multiple videos via text message to DeGraff, Pissios, and other investors of oil pumping rigs. The Satchell Creek Defendants carefully selected the very few "producing" wells to feature in their shared videos in order to give the impression that they were operating a successful oil venture when they were not. According to one investor, the JOA-3 investors "received frequent text and videos of oil wells being hit and oil spewing everywhere. Everyone was hooked."

100. At the end of May 2023, Peter Wilson texted Pissios and DeGraff "per Chris [Leiker]" to communicate that there were "50k to 100k of reserves per well on the stuff we are drilling." He claimed that they had "$105mm plus minus in reserves." This, too, was a knowingly false statement when made, as there were only a handful of producing wells out of many, and certainly no reserves of this magnitude.

101. On May 30, 2023, Peter Wilson, on behalf of the Satchell Creek Defendants, texted DeGraff and Pissios that "W4 today looks like 40 to 100 barrels. It was on the schedule for 20." The "W4,' refers to either the well Worcester A4-28, Worcester A4-22, or Worcester A4-21, the first two of which were non-producing. To the extent this message referred to either of those wells, this statement was knowingly false when made.

102. One June 6, 2023, Peter Wilson on behalf of the Satchell Creek Defendants texted Pissios and DeGraff stating, "We are 3 for 3 on the new wells. We are drilling 3 more and fracking 3 wells in JOA 3 as we speak." But as of that date, of the JOA-3 wells just tested in the month prior, five were non-viable and three were producing. SCP had not gone "3 for 3" in any sense.

103. On June 19, 2023, Peter Wilson on behalf of the Satchell Creek Defendants texted Pissios and DeGraff stating, "By the way we hit another well. 8 for 8 since the 15." Though it is unclear what "since the 15" means, SCP had never gone "8 for 8." This was, again, another attempt to falsely portray a wildly successful venture when there was none.

104. In the same vein, on July 14, 2023, Peter Wilson on behalf of the Satchell Creek Defendants texted Steve DeGraff "as you can see we are on a bit of a hot streak. The last 5 wells in JOA 5 were all successful and are in the process of being completed…" But as of that date, only 4 wells in JOA-5 were tested, three of which were non-viable. There was no "hot streak" and the data that Peter Wilson conveyed was knowingly false when shared.

105. The Satchell Creek Defendants' shameless lies did not relent. On July 20, 2023, Peter Wilson on behalf of the Satchell Creek Defendants, left a detailed voicemail on DeGraff's phone which stated "bottom line everything is going extremely well," claimed to have hit "a total 13 out of our last 13" wells, suggesting that 3 more wells were being finalized "which logs show they are productive as well," stated "Chris has had a reserve geologist working for the last 3 weeks on getting us a December number of reserves," and suggesting that "it looks like it's about a million barrels of reserves conservatively and that does not account for the 11 wells that have not been completed." He told them he guessed they had $1.5 million to 2 million in reserves" but that Alecko could "count on a million in reserves." All of these statements were knowingly false when made, and were designed to lure Alecko to keep their dollars invested and/or expand their investment to future JOAs.

106. The Satchell Creek Defendants then attempted to secure Alecko's investment in JOA-5, also with false statements. On September 22, 2023, Peter Wilson, on behalf of the Satchell Creek Defendants, left a voicemail on DeGraff's phone for Alex Pissios and DeGraff, stating that

JOA-5 was successful on 17 out of 20 wells. That JOA-5 was better than JOA3 and JOA4. That "last month we sold a little over 3,000k barrel for the month," estimating that number would double the following month. He then purported to give them a last opportunity to "take a piece of JOA5" which would allow Alecko to "increase your, or amortize your revenue over your investment base." By this date, the Satchell Creek Defendants knew that of the 20 JOA-5 wells, only six were producing oil. The rest were plugged, or were completed despite being non-viable. This voicemail was another knowingly false statement when made.

107. DeGraff asked Peter Wilson and Mike Hopson why wells that supposedly had oil were not being completed. They blamed it on the state being slow to grant permission, when in fact those wells were dry.

***The staged display of oil production.***

108. Around that time, in September 2023, certain investors (other than Alecko) again came to one of the Kansas well sites to see the production in progress. Leiker coordinated for the demonstration of four wells (the JOA-5 Hobbs wells) to the other investors visiting the site that day.

109. One of Leiker's lead workers in the field, Todd Dinkel ("Dinkel"), an individual with extensive experience in the oil production industry and a Satchell Creek employee, was instructed by Leiker on the morning of the visit that he "had to have 4 wells hooked up, 3-inch units set on the pump that day cause there was an investor that's flying in." Leiker instructed him that "all 4 of those wells better be running, they better be running 14 strokes per minute, they better be on oil."

110. Dinkel advised Leiker that while three of the wells could meet this requirement, the fourth well (Hobbs 4-34) could not. Dinkel raised this objection, stating to Leiker words along the lines of: "Chris, that's not feasible. That's not going to happen."

111. Leiker responded by threatening to fire Dinkel, with words to the effect of: "well that better fucking happen or you ain't gonna have a job by the time I get there; you're all fucking fired." Leiker thus threatened to fire Dinkel, demanding the appearance of oil production in the Hobbs 4-34 well.

112. Leiker directed Dinkel to transfer oil from the Hobbs 5-34 swab tank into the annulus of the Hobbs 4-34 well while it was running, making it appear as though the well was producing oil rather than water. Leiker said words to the effect of: "I want that oil pulled out of that swap tank on that 534. I want that poured down the backside of 434 so it's on color when we pull up there."

113. To the investors viewing the set of wells, it falsely appeared to them as if all wells were oil-producing, when they were not. The Satchell Creek Defendants knew that this was cause the investors to believe the well was productive, and that these investors would share this take-away with Alecko and any other investors not present onsite.

***Other intentional, fraudulent representations and omissions.***

114. The Satchell Creek Defendants made other misrepresentations and intentional omissions to secure money from and exploit the investors, including Alecko. For example, in the prospectus labeled "The St. Peter Prospect" for JOA-3, the Satchell Creek Defendants make the claim of an 80% success rate in drilling commercial wells. In reality, Satchell Creek's success rate was about half of what was claimed.

115. Garrett Geist and Dinkel confirmed that while the industry successful drill rate in the Kansas market was about 60-65%, SCP only hit on 5 of 73 wells, or a success rate of less than 7%, and of those 5 wells, only 2 are moderately viable.

116. The Satchell Creek Defendants also specifically lied about the JOA-3 opportunity, into which Alecko invested. JOA-3 was to contain 19 wells, which included 9 wells rolled over from JOA-2 (reported by the Satchell Creek Defendants as containing the "big ones"), plus 10 new wells.

117. Peter Wilson even went so far as to announce that there were *additional funds leftover*, so SCP would expand the program for *a couple of free wells*. The investors interpreted this both as a sign of monumental success in the venture, and as one of good faith from the Satchell Creek Defendants. In reality, it was just another complete lie.

118. The supposed great success of JOA-2 and then JOA-3 fueled interest in JOA-4, which was followed closely by JOA-5. For example, the Satchell Creek Defendants informed the JOA-4 investors that their 5 wells were awaiting special permitting in order to perform a technique called "Enhanced Oil Recovery" ("EOR"), a risky technique that injects water into a well to increase pressure near an oil field in the hopes of increasing oil production. However, testing results on the JOA-4 wells showed, instead, that EOR was an inappropriate technique for these wells because it is a technique typically done late in the life of a well when initial production has declined, *not* when there is no oil production to begin with. Indeed, the Satchell Creek Defendants – most specifically Leiker who had experience in oil drilling and knew EOR was inappropriate – proposed EOR as a distraction from their fraud (and to send the investors on a wild goose chase in considering the merits EOR).

119. SCP's former bookkeeper has identified another tactic used by the Satchell Creek Defendants to mask unproductive wells included, in productivity reports, dividing oil production equally among connected wells. Because several wells in a group would collect oil into a common tank, and the purchasing oil company that collected the oil would simply record the collective amount gathered from the collecting tank, the total amount produced could be divided among connected wells even if only one well produced all of the oil, while the rest produced nothing. The records thus falsely reflected a group of equally producing wells.

120. The bookkeeper has also reported that operating expenses for the wells were aggregated and only assigned to the producing wells, making the unproductive wells appear more profitable than they actually were.

***Additional diversion of investor funds to enrich Satchell Creek Defendants***

121. On top of taking hefty fees under the guise of legitimate service work in connection with (unnecessary) well completion, the Satchell Creek Defendants also siphoned off investor money with no apparent pretext. They did this by creating shell companies, each controlled by one or more Satchell Creek Defendant, and each maintaining bank accounts at the same financial institution as SCP of Equity Bank. Upon information and belief, Michael Hopson managed the inter-company transfer of dollars and commingling of funds (all of which were investor funds to begin with).

122. For example, the Satchell Creek Defendants caused investor dollars to pay for expenses related to a BAE 125-800 corporate jet that is parked at the Hays, Kansas airport and is owned by No Layover, LLC, a company registered by Michael Hopson in June 2023.

123. There was seemingly use of a second jet by Defendants as well; three separate entities appear on the invoice. A "Pay in Advance Account Application" from Textron Aviation

dated September 27, 2023 related to a "Raytheon Hawker 800A, 258237" was signed by Hopson. The "Billing Address" was Black Tea Oil Leasing, with "Company Owner(s)" listed as "Mike Hopson, Chris Leiker & Clay Wilson." Hopson's listed email address was "@featuredrilling.com" and the "accounts payable contact" listed, Lauren Gilomen, had an "@satchellcreekpetroleum.com" address.

124. The Satchell Creek Defendants also caused payments to be made to Chris Leiker's brother, Taylor, from multiple sources (all funded by investors), amounting to a salary of over $500,000 per year for performing little to no work on the well venture.

125. The Satchell Creek Defendants also caused numerous payments to be made to entities directly linked to them, such as DAK, DAK2, CXC (thought to be associated with Clay Wilson), HAI, and variations of the same names.

126. DAK LLC and DAK2 LLC each have Peter Wilson as their sole member. The "initial address" provided in drafts of each entity's operating agreements is 235 Puppy Smith St, #7669, Aspen CO 81612, the same address that Hopson used in his "Black Tea Oil LLC" email signature. DAK2 invoices contain information associated with Clayton Wilson. The entity uses the following contact information on its invoices: "945 Woodmont Blvd., Nashville, TN" (believed to be a residence associated with Clay Wilson) and all state "If you have any questions concerning this invoice, use the following contact information: Clayton Wilson, 949-395-1778, clay@theclayton.com". Indeed, "DAK LLC" or some variation of it was an entity that Peter Wilson favored using as, according to one of SCP's bookkeepers, Peter Wilson attempted to keep his name off documents as much as possible.

127. Though Peter Wilson, Clay Wilson, and Michael Hopson have zero oil drilling experience, they structured these entities as vehicles for taking large salary payments and fees – again, for "work" on wells they knew were non-viable.

128. As one example, Clay Wilson, conspiring with the other Satchell Creek Defendants, fraudulently invoiced SCP from May to August 2023 10 times through his/his father's company DAK2 LLC, and received $150,975 in supervisory fees by charging $450 for each day of "overseeing" well drilling, and another $450 for each day of "overseeing" well completion. Combining these invoices reveal that investor money was used to pay for 337.5 days of supervision in a 120-day period. Hopson was paid the identical payments Clay Wilson received on the same day, while Leiker received an even high amount each month. The Satchell Creek Defendants distributed invoices reflecting these fraudulent charges.

***The Satchell Creek Defendants commingle JOA funds and fail to transfer well ownership as required under the JOAs***

129. The commingling of funds was endless. Funds that were accepted for a particular JOA were supposed to remain available for that JOA only – investors in JOA-1 were to have their funds segregated and used only for JOA-1 purposes.

130. However, the Satchell Creek Defendants commingled JOA funds and moved dollars in and out of different JOAs like a Ponzi scheme. For example, investor dollars received for JOA-1 would be used to fund drilling for a subsequent JOA (or for well exploration unrelated to the JOAs which was intended to benefit the Satchell Defendants alone).

131. DeGraff repeatedly asked the Satchell Creek Defendants if funds were being commingled, and they assured him they were not.

132. The Satchell Creek Defendants also utilized the JOA structure to manufacture demand for later-phase JOAs. They would falsely exaggerate the performance of earlier JOAs, and

suggest that later phase JOAs were closed to additional investors, in order to give the appearance that the overall Kansas venture was so successful that they could not absorb additional investors.

133. The Satchell Creek Defendants routinely commingled JOA funds and/or misused JOA funds to support the drilling and/or completion of non-JOA wells.

134. Through "JOA-8 Partner Wells," the Satchell Creek Defendants added another layer to their scheme of mixing and matching JOA funds. They used investor funds from prior JOAs (or oil sales from other JOAs that were due investors) to finance the research into "Partner Wells." As confirmed by SCP's Senior Director of Investor Relations and Brand Marketing, Lauren Gilomen, if a Partner Well turned out to be a mega-oil well, no JOA would benefit – the Satchell Creek Defendants would take it as their own. If, however, a Partner Well turned out to be non-viable, the Satchell Creek Defendants would bundle it into another JOA, perpetuating their scheme of personally profiting off the investment fraud.

135. Investigation into this far-reaching scheme has also revealed that Leiker never transferred ownership of the Oil Well Leases to the respective JOAs financing that well.

136. The Satchell Creek Defendants misled investors into believing that they maintained a 75% interest in the leases of the wells in the various JOAs. As one example of this deception, Clay Wilson texted investor Will Ortale in June 2023 that "you also have equity in like 27 wells. Which is potentially worth more than a million dollars…"

137. In fact, the Satchell Creek Defendants failed to provide the investors with rights in the leases. This despite Black Oil Leasing charging each well $50,000 explicitly for obtaining those leases. This lease expense was placed upon the investors, yet they never actually received the promised equity in those leases.

138. Alecko first received confirmation that the SCP Defendants were likely engaged in a fraudulent scheme in or around November 2024.

139. In a conference call on November 19, 2024, investor Bryan Schroder alleged that Peter Wilson, Christopher Leiker, and Michael Hopson worked closely together in a leadership role on the venture, calling them “the three amigos.”

140. At another point in the call, Howard Strauss asked Hopson about money that was intended to be specifically invested in some wells nicknamed “Vincent.” Hopson admitted that the money earmarked for this investment had been spread around other companies in the scheme. Specifically, Strauss asked: “Okay, so several of us had a capital call on the Vincent property, and we sent you checks last spring, and Tom Riley and I, we flew out there to meet with you and Chris, and in the car, you told us that that Vincent property was gonna be settled within a couple of days. There was gonna be a settlement with the people that are next door to it, okay? And come to find out that those monies went elsewhere. So will you tell us where that money went?” Hopson replied: “Yeah, so you're completely, I don't know about what you mean by settled, but we were planning on closing on the Vincent deal. We had about 800,000 of the 1,750 raised. We were looking to sell our own royalty interest to cover it. Of it and we were never able to sell it. Everything started to go at this point getting turned down. ***So those monies actually were all co-mingled into the Satchell Creek account and then they were actually loaned to the featured drilling company to continue operating with payroll at that point***. So our goal all along was to sell those royalty interest and then make sure that we would pay everybody back and then ultimately get the rest of it would go into the Vincent's deal to clarify.” Strauss followed up with: “But the prospectus that you sent out specifically stated that the monies paid for Vincent were to be used to acquire the property next door, and I can't remember five or six producing wells there, and yet that money was

then sent to your drilling company, okay? ***And isn't that kind of a malfeasance of funds***? I mean, ***what you did and what you said different things***." Hopson responded: "Yeah, I'm unaware what the actual ***but that's that is what happened***." (emphasis added).

141. Also in November of 2024, investor Peter Strauss sent an email to fellow investors and some defendants (including Leiker who, at the time, was using satchellcreekrestoration@gmail.com, suggesting the existence of yet another shell entity), accusing Peter Wilson, Clay Wilson, Michael Hopson, and Chris Leiker of misconduct:

a. "Since inception of this project, I believe we all can agree that the element we have been missing is consistent communication from the top. To be clear, the **'Top'** is Peter Wilson, Mike Hopson, Chris Leiker, and Clay Wilson. I won't take personal shots but we can all recognize that each had key roles in this venture." (original emphasis).

b. Strauss indicated that he thought the "collective investment" over "approximately 18 months" was $39 to $50 million. He outlined a catastrophic situation: "[W]e have all witnessed tens of millions of dollars of which some consist of individuals life savings, retirement planning, and collective family investments dwindle to the point that there are now millions of dollars of debts/liens, over 30 lawsuits filed, fines from the KCC, holes to be filled, and an expired operational license. Gross Mismanagement would be the kindest words I could possibly find to describe what has taken place."

c. "While I recognize that a tremendous amount of information has been shared in a short period of time and much of it is hard to fathom, it still is beyond comprehension that anyone would actually consider allowing Chris, Mike, Pete, or Clay to stay involved in this project. This would be the very definition of insanity. In the shortest period of time possibly

imaginable, we have all witnessed the destruction of tens of millions of dollars, people's life savings, families, and so forth-all at the hands of Chris, Mike, Pete, and Clay. They will have to deal with the blood on their hands."

142. In early January 2025, Leiker was spotted collecting (stealing) oil from a JOA well (which was normally to be collected by an independent vendor) and was reported to local law enforcement.

143. Plaintiff has learned that Leiker solicited investment for a Nebraska well from Satchell Creek investor Peter Strauss. Though it is not known when this offer was made, Strauss had by that time become dubious of Leiker and declined the offer.

**COUNT I**
**Violation of 18 U.S.C. § 1962(c) (RICO)**
**(against the Satchell Creek Defendants)**

144. Plaintiff incorporates by reference all preceding paragraphs.

145. The Satchell Creek Defendants, and SCP itself, along with numerous shell companies created by the Satchell Creek Defendants to further the criminal purpose of the enterprise, including but not necessarily limited to DAK, DAK2, HKP, HKP2, Black Tea Oil, LLC, Black Tea Oil Leasing, LLC, Feature Drilling, LLC, Royaltea LLC, Hydratech, LLC, Partners Petroleum LLC, Partners H20, LLC, CXC, LLC (owned or controlled by Clay Wilson), Professional Pulling Services, LLC, and Partners Drilling, LLC (together, the "Enterprise Participants") conducted or actively participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Alternatively, the Satchell Creek Defendants and the Enterprise Participants, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of the Satchell Creek

Defendants and Enterprise Participants were in furthering of the Enterprise and in violation of 18 U.S.C. § 1962(d).

146. The Enterprise is an association-in-fact of SCP, the Satchell Creek Defendants, and the Enterprise Participants.

147. The pattern and practices of RICO violations are continuous and ongoing.

148. The Enterprise and the Satchell Creek Defendants' RICO violations – specifically, the fraudulent representations concerning the oil investment, the ongoing wrongful retention of investor funds, and the refusal to honor leasehold rights – continue. Plaintiff was not and could not have been aware of the Satchell Creek Defendants' pattern of misconduct before May 2023, when Plaintiff invested millions of dollars in the fraudulent schemes.

149. From March 2023 to the present, Satchell Creek Defendants concealed the nature and extent of the wells' performance, concealed DST results showing the true viability (or lack thereof) for the wells, concealed that it was "completing" non-viable wells, and concealed that the Satchell Creek Defendants were personally profiting from dry wells, knowing any work performed on those wells was in vain. Instead, the Satchell Creek Defendants promoted the investment with false enthusiasm, and presented false information, data, and even visual depictions of the wells to portray the venture as lucrative for investors when they knew it was not.

150. As a result, Plaintiff could not have discovered the Satchell Creek Defendants' conduct, its control of the Enterprise, or the structure of that Enterprise by exercising reasonable diligence.

151. Satchell Creek Defendants' motive in conducting the Enterprise described herein with respect to the pattern and practice of affirmative fraud and the ongoing concealment of wrongdoing from 2023 to the present was to deceive Plaintiff into believing that SCP was

overseeing, supervising, and facilitating a lucrative oil investment. The Satchell Creek Defendants' personal enrichment rested on the continued success of every aspect of this scheme.

152. The scheme was designed to achieve, and did achieve, its intended result: Alecko suffered damage to its business and property.

153. The Satchell Creek Defendants repeatedly used e-mail, text message, and voicemail systems to commit their fraud, as described in this Complaint.

154. Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by…any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…"

155. The Satchell Creek Defendants as identified herein are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962 (c).

156. The Enterprise was in engaged in, and the activities of the Enterprise affect, interstate commerce, as they directly involved fraudulently solicitating investors from around the country to contribute to the Kansas-based investment, and invited investors, including Alecko, to cross state lines in order to view wells (and on at least one occasion, to view a staged display of oil production).

157. The association-in-fact Enterprise consists of Defendant SCP, the Satchell Creek Defendants, and a host of other entities which the Satchell Creek Defendants created and used to implement their fraudulent scheme.

158. Satchell Creek Petroleum, LLC, acting through Leiker, Hopson, and Peter and Clay Wilson, exerted ongoing and continuous control over the Enterprise, and participated in the operation or management of the affairs of the Enterprise, through the following actions:

a. Asserting direct control over false, deceptive, and misleading information disseminated to Plaintiff and the other investors in the various schemes related to SCP;

b. Asserting direct control over the creation and operation of the elaborate scheme used to funnel hoax fees and costs into their other entities and/or into their own personal bank accounts;

c. Directing employees and/or agents of Enterprise Participants in positions of control in the Enterprise, including, for example, directing them to falsify testing results, or stage fake oil production;

d. E-mailing, texting, and recording voicemails containing misrepresentations and omissions to Plaintiff and the other investors on the dates identified above.

159. From its inception, the Enterprise had a clear decision-making hierarchy or structure, with SCP, acting through Leiker, Hopson, Clay Wilson and Peter Wilson, positioned at the top. SCP paid Leiker and Hopson not simply as employees but rather as co-conspirators, in order to help the Enterprise succeed in securing millions of dollars in investment for its schemes.

160. Through SCP, Leiker, Hopson, Clay Wilson, and Peter Wilson, exercised and continues to exercise maximal control of the Enterprise, all of the Enterprise's members are distinct from the Enterprise and its activity and each exercised and continues to exercise control over various functions of the Enterprise.

161. The persons and entities comprising the Enterprise have associated together for the common purpose of allowing SCP to collect tens of millions of dollars in investments, defrauding Plaintiff and the other investors out of those funds.

162. The network developed by SCP, through the Satchell Creek Defendants, to lure investment dollars from Plaintiff and the other investors in the schemes was and is the passive instrument of the Satchell Creek Defendants' racketeering activities, and together, constitutes an alternative "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

163. This Complaint details the ongoing pattern of racketeering based on facts that are known to Plaintiff and their counsel. It is filed without the benefit of discovery, which will likely uncover many more predicate acts and further demonstrate the breadth and scope of the Enterprise's racketeering.

164. The Enterprise – with SCP at the hub, acting through the Satchell Creek Defendants, engaged in a pattern of racketeering activity. From approximately March 2023 at least through suspicion of the fraud in November 2024, SCP, the Satchell Creek Defendants, and the Enterprise, engaged in activities which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts, as set forth herein.

165. The foregoing pattern of racketeering activity is distinct from the Enterprise itself, which does not solely engage in the above-described acts.

166. SCP and the Satchell Creek Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes predicate acts indictable under 18 U.S.C. § 1343 (wire fraud) through the aforementioned actions.

167. In implementing the fraudulent scheme, SCP was aware that Plaintiff and the other investors in the schemes depended on the honesty of SCP to represent truthfully the facts of the proposed oil venture.

168. As detailed above, the fraudulent scheme consisted of, inter alia, using wire fraud to enable SCP to deliberately misrepresent the status and viability of the wells SCP had or was intending to drill and/or complete, and to conceal the involvement of the Enterprise Participant entities in extracting fees and other funds in furtherance of completing wells that were known to be non-viable.

169. The unlawful predicate acts of racketeering activity committed by SCP and the Satchell Creek Defendants had a common purpose, were related, and had continuity. From its inception, the scheme depended upon concealing the status and viability of the wells SCP had or was intending to drill and/or complete. Without such concealments, the scheme would have failed in its purpose, as no reasonable investor would have supplied investment funds to a knowingly failed oil venture, or to purchase a share in knowingly dry or underperforming wells.

170. The Enterprise used the wires (e-mail, text message) to execute and manage their scheme, acting in violation of 18 U.S.C. § 1343. Each of the fraudulent e-mails (along with their attachments) and text messages constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations occurring over several years, are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

171. All predicate acts committed by the Satchell Creek Defendants and the Enterprise are related and were committed with a common scheme in mind: to lure investors to contribute millions of dollars to an oil venture with they knew was doomed from the get go, and which was

designed to enrich SCP and the Satchell Creek Defendants regardless of whether the oils they explored proved to be viable.

172. SCP and Satchell Creek Defendants' conduct of the Enterprise was designed to, and succeeded in, defrauding Plaintiff and other investors in the schemes.

## COUNT II
## Violation of 18 U.S.C. § 1962(d) by Conspiracy to Violate 18 U.S.C. § 1962(c) (RICO) (against SCP and the Satchell Creek Defendants)

173. Plaintiff incorporates by reference all preceding paragraphs.

174. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

175. SCP and the Satchell Creek Defendants violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity. SCP, the Satchell Creek Defendants and the other Enterprise Participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

176. SCP, the Satchell Creek Defendants and the other Enterprise Participants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and the other investors of money.

177. The nature of the above-described acts, material misrepresentations and omissions in furtherance of the conspiracy gives rise to an inference that SCP, the Satchell Creek Defendants and the other Enterprise Participants not only agreed to the objective of an 18 U.S.C. § 1962(d)

violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

178. As a direct and proximate result of these overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff has and continues to be injured in its business or property, as set forth more fully above.

**COUNT III**
**Common Law Fraud**
**(against SCP and Satchell Creek Defendants)**

179. Plaintiff incorporates Paragraphs 1-143 by reference.

180. The statements described in ¶¶ 5, 37-38, 43, 59, 60, 65-66, 68-70, 72-80, 82-84, 87-91, 93-107, 114, 116-118, 131, and 136 were false statements of material fact.

181. To the extent that such false statements of material fact were communicated by only one Satchell Creek Defendant, they were communications sent with the approval of and on behalf of SCP and all Satchell Creek Defendants, who were aware of, and instructed that those false statements of material fact be made.

182. SCP and the Satchell Creek Defendants knew that the statements described herein were knowingly false when made, as set forth in detail above.

183. SCP and the Satchell Creek Defendants intended to induce Plaintiff to act in reliance on these false statements of material fact, specifically, they intended to induce Plaintiff to participate as in investor, to induce Plaintiff to sign JOAs, and to induce Plaintiff to keep its money invested.

184. Plaintiff did reasonably rely on the truthfulness of these statements and has been injured as a direct and proximate result of that reliance.

**COUNT IV**
**Civil Conspiracy**

**(against the Satchell Creek Defendants)**

185. Plaintiff incorporates Paragraphs 1-143 by reference.

186. The fraud described above involved a combination of two or more persons, namely, Leiker, Hopson, and Peter Wilson and Clay Wilson, i.e., the Satchell Creek Defendants.

187. The Satchell Creek Defendants combined for the unlawful purpose of fraudulently soliciting, obtaining, and retaining investment dollars from Plaintiff and the other investors.

188. In furtherance of this unlawful purpose, each of the Satchell Creek Defendants committed an overt tortious or unlawful act, as described above.

189. Plaintiff has been directly and proximately harmed by this conspiracy.

## COUNT V
**Negligence**
**(against The Clayton)**

190. Plaintiff incorporates Paragraphs 1-143 by reference.

191. At all relevant times, Clay Wilson was associated with The Clayton (owned, upon information and belief, by himself, Mark Walter, and Donald Thompson), either as an employee, agent, representative or owner of Havana Room Cigars, L.L.C., of HR Liquors, L.L.C., or both.

192. Clay Wilson used his knowledge of and access to the private membership list of The Clayton in order to lure high net worth individuals, including Plaintiff's principals, to participate in the Oil Well Fraud.

193. Clay Wilson used the facilities of The Clayton to conduct meetings in which he lured high net worth individuals, including Plaintiff's principals, to participate in the Oil Well Fraud.

194. Clay Wilson used his work e-mail address (clay@theclayton.com) to communicate with Plaintiff and other investors regarding the Oil Well Fraud, including on communications containing material and knowing misrepresentations.

195. When invoicing the investors for "supervisory fees", to the extent Clay Wilson did not actually perform supervision services, these fees were described in a way to cover up him getting a piece of the investments he solicited through The Clayton. Clay Wilson provided his contact information for The Clayton if there were any questions about the charges:

Make all checks payable to DAK2 LLC

If you have any questions concerning this invoice, use the following contact information:

Clayton Wilson,949-395-1778 , clay@theclayton.com
**THANK YOU FOR YOUR BUSINESS!**

196. In other words, Clay Wilson used The Clayton as his breeding ground for luring investors, used it as his façade for communicating with them, and abused the trust and discretion that Alecko's principals thought they had bargained for when purchasing memberships in The Clayton – all directly in furtherance of the fraud described above.

197. The Clayton (that is, Havana Room Cigars, L.L.C., and/or HR Liquors, L.L.C), as Clay Wilson's employer, had a duty to supervise Clay Wilson to ensure Clay Wilson was not committing civil wrongs (such as those described here) and potential crimes by utilizing The Clayton for those unlawful purposes, and that he was not using the assets of The Clayton including its membership list, facilities, or its existence for purposes not directly related to the club and its operations.

198. The Clayton negligently supervised Clay Wilson, allowing him to do whatever he pleased within The Clayton, and with access to The Clayton's membership list and private

members, to conduct the fraud described herein. Indeed, The Clayton's negligence in not having appropriate controls in place permitted Clay Wilson to engage in the wrongful conduct described in this Complaint.

199. The Clayton's negligence proximately caused Plaintiff's injuries, as Plaintiff would have never invested in the Oil Well Fraud were it not for Clay Wilson identifying, targeting, and luring Plaintiff's principals as the result of them being private members of The Clayton.

**COUNT VI**
**Aiding and Abetting Fraud**
**(against The Clayton)**

200. Plaintiff incorporates Paragraphs 1-143 and 179-184 by reference.

201. As described herein, the Satchell Creek Defendants engaged in fraudulent conduct which caused an injury to Plaintiff.

202. Clay Wilson assisted the Satchell Creek Defendants in engaging in the wrongful conduct described herein.

203. The Clayton (through the conduct of Clay Wilson who serves as a representative and agent of The Clayton) was aware of its role in the wrongful conduct being perpetrated, and knowingly and substantially assisted in the fraudulent solicitation of funds and other wrongful conduct described herein. The Clayton's negligence proximately caused Plaintiff's injuries, as Plaintiff would have never invested in the Oil Well Fraud were it not for Clay Wilson identifying, targeting, and luring Plaintiff's principals as the result of them being private members of The Clayton.

WHEREFORE, Plaintiff requests that the Court enter judgement in its favor and against Defendants as follows:

a. An award of money damages in an amount to be determined at trial;

b. An award of punitive damages in an amount sufficient to deter such future conduct;

c. An award of attorneys' fees, costs and expenses.

d. Pre-judgment interest and post-judgment interest at the maximum rate allowable by law; and

e. Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**ALECKO O+G LLC**

By: /s/ Steven P. Blonder
One of Its Attorneys

Steven P. Blonder (6215773)
Laura A.Elkayam (6303237)
**MUCH SHELIST, P.C.**
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 521-2000
(sblonder@muchlaw.com)
(lelkayam@muchlaw.com)

**CERTIFICATE OF SERVICE**

I, Steven P. Blonder, an attorney, hereby certify that on January 28, 2026, I electronically filed the foregoing document, **PLAINTIFF ALECKO O+G LLC's FIRST AMENDED COMPLAINT** via the Court's CM/ECF system, which will send a copy to all attorneys of record.

*/s/ Steven P. Blonder*